JOSHUA J. MOORE, PLAINTIFF, *v.* JAMES BROWN, ALFRED BROWN, HARMON HOGAN, AND JOSEPH FROWARD.

According to the statute of limitations passed by the State of Illinois, a defendant in ejectment who had been in possession of the land by actual residence thereon, having a connected title in law or equity deducible of record from the State or the United States, or from any public officer or other person authorized by the laws of the State to sell such land for the non-payment of taxes, &c., might defend himself by pleading that he had been in possession as aforesaid for seven years.

But where a defendant offered a deed in evidence, purporting to be a deed from an officer authorized to sell for taxes, and the deed upon its face showed that the officer had not complied with the requisitions of the statute, this was a void deed, made in violation of law, and did not bring the defendant within the benefit of the statute of limitations.

He must have a connected title from some one authorized to sell, and in this case the officer was not so authorized. The deed was not, therefore, admissible in evidence.

THIS case came up from the Circuit Court of the United States for the District of Illinois, upon a certificate of division in opinion between the judges thereof.

The whole case was contained in the certificate, which was as follows: —

" *The United States of America, District of Illinois.*

" At a Circuit Court of the United States, begun and held at Springfield, for the District of Illinois, on Monday, the 7th day of June, in the year of our Lord 1847, and in the seventy-first year of our independence.

· " Present, the Hon. John McLean and the Hon. Nathaniel Pope, Esquires.

" JOSHUA J. MOORE *v.* JAMES BROWN, ALFRED BROWN, HARMON HOGAN, and JOSEPH FROWARD.

" *State of the Pleadings.*

" This is an action of ejectment, brought under the statute of the State of Illinois, and plea not guilty of withholding the premises, according to the same statute.

" This cause coming to trial this term, the plaintiff proved title in himself, regularly derived from the United States, and by special agreement the possession of the defendants was admitted.

" The defendants then proposed to prove that they had been possessed of the premises in question by actual residence thereon, having a connected title thereto in law or equity, deducible of record from a public officer of the State of Illinois, authorized by the laws of the State to sell land for the non-payment of taxes, for the term of seven years next preceding

Moore v. Brown et-al.

the commencement of this suit; and as the first link of evidence towards making such proof, stating that they would follow it up by other complete proofs, offered in evidence a deed made by the Auditor of Public Accounts of the State of Illinois, which deed is in the words, figures, and seal following, to wit:—

"'The Auditor of Public Accounts of the State of Illinois, to all who shall see these presents, greeting: Know ye, that whereas I did, on the 9th day of December, 1823, at the town of Vandalia, in conformity with all the requisitions of the several acts in such cases made and provided, expose to public sale a certain tract of land, being the south half of section thirty-five, township twelve north, in range one west of the fourth principal meridian, for the sum of $ 10.81, being the amount of the tax of the years 1821 and 1822, with the interest and costs chargeable on said tract of land. And whereas, at the time and place aforesaid, Stephen Davis offered to pay the aforesaid sum of money for the whole of said tract of land, which was the least quantity bid for; and the said Stephen Davis has paid the sum of $ 10.81 into the treasury of the State; I have granted, bargained, and sold, and by these presents, as auditor of the aforesaid State, do grant, bargain, and sell, the whole of said south half of section thirty-five, in township twelve north, in range one west of the fourth principal meridian, to Stephen Davis, his heirs and assigns. To have and to hold said tract of land to the said Stephen Davis and his heirs for ever; subject, however, to all the rights of redemption provided for by law.

"'In testimony whereof, the said auditor has hereunto subscribed his name and affixed his seal, this 20th day of June 1832.                                     J. T. B. STAPP, *Auditor.*'

" ' *State of Illinois, State Recorder's Office, ss.*

"'I certify that the within deed has been duly recorded in this office, in Vol. F, page 281. Given under my hand and seal of office, at Vandalia, this 31st day of May, A. D. 1833.
'JAMES WHITLOCK, *State Recorder.*

"'Fees 43¾ record.
          37½ cert. and seal.
    $ 0.81¼.'

" Which deed includes the premises in question in this suit; to the introduction of which deed the plaintiff objects, on the ground that, by reference to the face of the deed, and the law as it then stood ('An Act entitled An Act for levying and collecting a tax on land and other property,' approved February 18th, 1823), it appeared that the sale for the non-payment of

taxes had been made by the auditor at an earlier day than he could according to law possibly do.   And so it occurred as a question whether said deed was admissible in evidence for the purpose and in the connection for and in which the defendants offered it, the objection aforesaid notwithstanding; on which question the opinions of the judges were opposed.   Whereupon, on motion that the point on which the disagreement has happened may during the term be stated, under the direction of the judges, and certified under the seal of the court to the Supreme Court, to be finally decided, it is ordered, that the foregoing statement of the case and facts, made under the direction of the judges, be certified according to the request of the plaintiff, and the law in that case made and provided."

It was argued for the plaintiff in a printed argument prepared by *A. Williams*, Esq., who was not an attorney of this court, and therefore the argument was adopted and signed by *Mr. Butterfield.*   No counsel appeared for the defendants.

The argument for the plaintiff was as follows: —

This was an action of ejectment brought by the plaintiff, Moore, against the said defendants, in the Circuit Court of the United States for the District of Illinois.

On the trial, at the June term of 1847, the plaintiff proved title to the land sued for in himself, and that the defendants were in possession of the same at the commencement of this suit, and rested his case.

The defendants then, in order to make out a defence under the limitation act of Illinois, passed in 1835, offered in evidence, as the foundation of their title, a deed from the Auditor of Public Accounts for the State of Illinois, which is set out at length in the record.   It purports, on its face, to have been executed by virtue of a sale made on the 9th day of December, 1823, for the non-payment of taxes under the revenue act passed February 18, 1823.

Upon the admissibility of this deed as evidence, the judges were opposed in opinion.

The revenue act of 1823 requires the owners of lands to pay the tax thereon into the State treasury on or before the 1st day of October, and the seventh section provides that, if they shall fail, refuse, or neglect to pay the taxes aforesaid, it shall be the duty of the auditor to make a transcript from his books of all such delinquents, charging the tax with an interest at the rate of six per centum per annum, until paid, and all costs which may accrue; and cause the same to be advertised in the paper printed at the seat of government, or in some other

paper printed in the State, for three weeks, giving notice of the day of sale, the last of which publications shall be at least two months before the day of sale, and the auditor shall proceed to sell, on the day fixed in such advertisement, the whole, or so much of each tract as will pay the tax, interest, and costs."

It will be seen from the foregoing, that the auditor could not possibly be authorized to sell before the 15th of December, and as the deed shows that the sale was made on the 9th of December, it is absolutely void, as appears upon its own face. It was therefore clearly inadmissible as evidence of title, and the only question presented for the decision of the court is, whether it was admissible as evidence of "a connected title in law or equity," within the meaning of the limitation act of 1835. The second section of that act is in these words: "Every real, possessory, ancestral, or mixed action, or writ of right brought for the recovery of any lands, tenements, or hereditaments, of which any person may be possessed by actual residence thereon, having a connected title in law or equity, deducible of record from this State or the United States, or from any public officer or other person authorized by the laws of the State to sell such land for the non-payment of taxes, or from any sheriff, marshal, or other person authorized to sell such land on execution, or any order, judgment, or decree of any court of record, shall be brought within seven years next after possession being taken as aforesaid," &c. This act is found on page 349 of the Revised Statutes of 1845, § 8.

It is freely admitted, that the legislature did not intend, by the words "a connected title in law or equity," a perfect and indefeasible title, because such a title would need no legislative protection; but we insist that they never intended to extend this protection to a person in possession under a deed absolutely void upon its own face.

That they did not so intend will most manifestly appear from an examination of two other acts on the same subject, still in full force. The first was passed in 1827, and provides, "that every real, possessory, ancestral, or mixed action, or writ of right, brought for the recovery of any lands, tenements, or hereditaments, shall be brought within twenty years next after the right or title thereto, or cause of such action, accrued, and not after." See Revised Statutes of 1845, p. 349, § 7.

Something more than mere naked possession is necessary to constitute a bar under this act. The possession must be adverse, and though it is not easy to determine, in all cases, what is adverse possession, it may be affirmed that it must be a pos-

session held by a person-claiming the land in his own right, Bell *v.* Fry, 5 Dana, 344. In Tillinghast's Adams on Ejectment, p. 451, it is laid down as a rule, that, "to constitute a valid and effectual adverse possession, it is necessary that it be commenced under color and claim of title." And at p. 453 it is said: ".But no act or deed which is void can be the foundation of an adverse possession, for it can give no color of title." See Den ex dem. Walker *v.* Turner, 9 Wheat. 541.

In Jackson ex dem. Ten Eyck *v.* Frost, 5 Cowen, 350, 351, Savage, Chief Justice, delivering the opinion of the court, says: " I am aware that it was said, in the case of Jackson *v.* Thomas (16 Johns. 301), that if a man enters on land without claim or color of title, and no privity exists between him and the real owner, and such person afterwards acquires what he considers a good title, from that moment his possession becomes adverse. This doctrine must not be understood as authorizing the purchaser to consider a naked possession a good title. It must be, as I understand the law, such a title as the law will, *primâ facie*, consider a good title. Otherwise, there would be no uniformity. The character of the possession might be made to depend upon the understanding of the tenant; and the same possession which would be a good defence to one would be worthless to another, and hence a possession under a French grant was held not to be adverse, because such a grant could not possibly be the source of a good title."

It is said in Dufour *v.* Camfranc, 11 Martin, 715, that a title "void in itself will prevent him in whose favor it was executed from pleading prescription." (See also 1 Martin, N. S. 324; 4 Martin, N. S. 224.) It is doubtful from these authorities, whether the auditor's deed would be even sufficient to constitute adverse possession, and there is certainly no pretext for saying that it amounts to any thing more than color of title, and the legislature clearly intended, by the words "a connected title in law or equity," something more than color of title, as they have provided that a possession held under the one for seven years should be a bar, whilst under the other they require a possession of twenty years to constitute the bar.

But again. On the 2d of March, 1839, the legislature passed an act "to quiet possessions and confirm titles to land," which provided, among other things, that " hereafter every person in the actual possession of lands or tenements, under claim and color of title, made in good faith, and who shall for seven successive years after the passage of this act continue in such possession, and shall also, during said time, pay all taxes legally assessed on such lands or tenements, shall be held and

adjudged to be the legal owner of said lands or tenements, to the extent and according to the purport of his or her paper title." (See Session Acts 1838 and 1839, p. 266; also found in Revised Statutes of 1845, p. 104, § 8.)

This act, passed when the two former acts were in force, without attempting to repeal either of them, requires, in addition to seven years' actual possession under "claim and color of title," that the color of title should be made in good faith, and also requires the payment of taxes for seven years; showing clearly that the legislature intended by the act of 1835 something more than claim and color of title. These acts were all reënacted in 1845. (See Revised Statutes of 1845, as above quoted.)

Taken together, they show the legislative intention to be, 1st, that where a person rests his defence upon adverse possession merely, he must show a possession of twenty years; 2d, that where he relies upon a possession held under claim and color of title merely, he must show, in addition to seven years' possession, that the color of title was made in good faith, and also that he had paid the taxes for seven successive years; and 3d, that when he relies on possession under a connected title in law or equity, &c., he must show, in addition to his title, seven years' actual possession, by residence on the land. I repeat, then, that it is evident that the legislature meant by the words "a connected title in law or equity" something more than "claim and color of title made in good faith." What, then, did they mean? They most clearly intended, as Chief Justice Savage expresses it, "such a title as the law will *primâ facie* consider a good title"; or, as expressed by the Supreme Court of Kentucky, "a title which is good when tested by itself."

This is the reasonable construction upon general principles of law, strengthened by the several acts of the legislature on the subject. But there is another view which renders it imperative. The act of 1835 was copied from the Kentucky act of limitation of February 9, 1809. The words, "a connected title in law or equity deducible of record," &c., are copied literally from the Kentucky statute, and of course they were adopted with the construction which they had previously received from the courts of Kentucky. In the case of Skyles's Heirs v. King's Heirs, decided by the Supreme Court of Kentucky in 1820 (fifteen years before these words were copied into the Illinois statute), and reported in 2 A. K. Marshall, 387, the court say: "The true construction, then, of the words of the statute, 'a connected title in law or equity deducible from the Commonwealth,' does and must mean such title when tested

by its own face, and not tried by the title of others. If the defendant's title should be a connected title in law or equity, supposing no other to exist on the ground, then if he proves seven years' possession holding under it, the statute shall aid him, although the plaintiff may be able to show, by the production of his own title or that of others, that the title did not in law or fact pass to the defendant."

The deed offered in evidence in this case was not such as the law would *primâ facie.* consider good. It is not good when tested by its own face, but it is absolutely void upon its own face. It was contended on the other side, that this deed was not void upon its face, because it only appears to be void when the facts appearing upon its face are compared with the law. In this sense, no deed can be void on its face. Deeds are valid or void according as they are in conformity with or in violation of the law, and they can neither be pronounced valid or void but by applying to them the law. The court is supposed to know and apply the law to the deed, and when, from this knowledge of the law and an inspection of the deed, a court is enabled to pronounce it void, then it is void upon its face; but when its invalidity is shown by evidence *dehors* the deed, then it is not void upon its face. The statute requires "a connected title in law or equity deducible of record from this State, or the United States, or from any public officer or other person authorized by the laws of this State to sell such land for the non-payment of taxes, or from any sheriff or marshal, or other person authorized to sell such land on execution, or under any order, judgment, or decree of any court of record. The title is to be deduced from one of four sources. In this case it is attempted to deduce it from a person authorized by law to sell the land for the non-payment of taxes. If this deduction of title can be made out in this case, through a void deed, it may be so done in each of the other cases. It will hardly be contended that a title could be deduced from the State or the United States through a patent void on its face, or that title could be deduced from a sheriff or marshal through a void deed, or one founded on a void judgment (see Walker *v.* Turner, 9 Wheat. 541); or that a sheriff's deed of the land of A, under a judgment against B, would be such a title as the law requires.

The law requires a connected title. The auditor's deed was one link in the chain of title, and is in no respect distinguishable from the other links in the chain; and if this first link in the chain may be furnished by a void deed, so may each of the other links in the chain. In deducing title from the United States under this statute in the Circuit Courts of the State, a

party is universally required to show a valid patent and chain of valid deeds, duly authenticated, from the patentee to the defendant, and this is the universal sense of the profession in the State. No case involving the construction of the statute has ever been decided by the Supreme Court of Illinois.

The title must be deduced from a person authorized by law to sell such land for the non-payment of taxes. The auditor was not authorized to sell this or any other land at the time when the deed shows the sale to have been made. He had no general authority to sell lands, but only to sell such lands as have been listed with and advertised by him, and then only in the manner prescribed by law. In reference to a deed made under this same act, but where the defect did not, as in this instance, appear on the face of the deed, the Supreme Court of Illinois say: ".The publication of notice of sale by the auditor, as required by law, is not one of these facts inferred from his deed, nor is the proof thereof thrown upon the former owner. The duty of the auditor to publish this notice is imperative. His authority to sell is limited, by the express words of the law, to the land advertised as aforesaid, and as the rule of law which required the purchaser to show the performance of this prerequisite was not changed by the act of 1827, he should therefore have adduced evidence to that effect. Without proof of this fact, the auditor's deed was not evidence of the regularity and legality of the sale, and consequently conveyed no title to the purchaser." Garrett *v.* Wiggins, 1 Scam. 337; also Hile *v.* Leonard, 1 Scam. 140; and Wiley *v.* Bean, 1 Gilm. 302.

It may be remarked, that, although the Supreme Court of Illinois have held, in relation to sales under the revenue law of 1829, that the auditor's deed alone was *primâ facie* evidence of title, yet they have never so held in relation to sales under the revenue law of 1823, under which the sale in this case was made, and the decisions above quoted have never been questioned.

The deed, then, was not evidence of a title deducible from a person authorized by law to sell such land, &c. The auditor derived his authority from the law. The law was his warrant or power of attorney to sell the land of another without his consent, and is certainly entitled to no more favorable construction or consideration than a power of attorney voluntarily executed by the owner of the land, authorizing its sale in a certain prescribed mode. Then suppose the auditor to have made this sale under such power of attorney, executed by the owner, authorizing the sale on precisely the terms prescribed by this statute, and the auditor had sold in precisely the same

manner that he did in this case, would any person pretend that his deed would be evidence of title for any purpose whatever?

The legislature intended to extend this protection to persons who occupied land under a connected title, *primâ facie* good, against proof *aliunde* which would rebut or destroy such *primâ facie* title. There is no hardship in requiring a person to know the law, and to take notice of defects appearing upon the face of his own title. There is reason and policy in protecting a person who has a title, good *primâ facie,* against evidence or facts the existence of which he has not the means of knowing. It is, on the other hand, but justice to the owner who is to lose his land by so short a limitation, that the statute should be restricted to persons holding under a title *primâ facie* good. This construction preserves the policy of the law in helping the vigilant and not the careless. It preserves the well-founded distinction between mistakes of law and fact. The law always relieves against the latter, but never against the former. It has the advantage of certainty, whilst the opposite construction would introduce all the mischiefs of uncertainty, without furnishing any landmark for the guidance of courts and parties.

In Louisiana a person may prescribe for land of which he has held the possession under a just title, which is defined by the Civil Code of that State to be " a title which the possessor may have received from any person whom he honestly believed to be the real owner."

Under this law it has been held that, "if the title under which the acquisition is made be null in itself, from defect of form, or discloses facts which show the person from whom it is acquired has no title, it cannot form the basis of this prescription, because the party acquiring must be presumed to know the law, and consequently wants the *animo domini* which is indispensable in cases of this kind; but where the title is free from these defects, and the property is not transferred by want of title in the person making the transfer, then it forms a good ground for the prescription; or, in other words, the inquiry is whether the error be one of fact or of law." Frique *v.* Hopkins et al., 4 Martin, N. S. 224.

The occupying claimant act of Kentucky provides, " that if any person hath peaceably seated or improved, or shall hereafter so seat or improve any lands, supposing them his own by reason of a claim in law or equity, the foundation of such claim being of public record, but which lands shall prove to belong to another, the charge and value of seating and improving shall be paid by the right owner to such seater," &c. 2 Morehead's Stat. 1231. In the construction of this statute, the courts of Kentucky adopt the same distinction between error

of fact and of law, holding that persons who, by a knowledge of the law, might know they had no title, were not within the meaning of the statute. Barlow *v.* Bell, 4 Bibb, 106 ; Clay *v.* Miller, 4 Bibb, 461 ; Young *v.* Murray, 3 A. K. Marsh. 58.

Under the Tennessee limitation law, which required seven years' possession under a title founded upon a patent, it was held that a sheriff's deed, founded on a sale under a void judgment, was not a title within the meaning of the law. Walker *v.* Turner, 5 Peters, 668. In this case the advertisement stands in the place of the judgment. In the Tennessee case the judgment and execution gave authority to the sheriff to sell. In Illinois, according to the decision in the case of Garrett *v.* Wiggins, 1 Scam. 335, the advertisement authorized the auditor to sell, and the advertisement in this case, if any was made, being void, his deed was not a title within the meaning of the Illinois limitation law, unless the summary and *ex parte* sales are to be more favored than sales made under judgment and execution, which will scarcely be contended.

In the case of Powell *v.* Harman, 2 Peters, 241, the defendant proved that he had been in peaceable possession of the land for more than seven years, holding adversely to the plaintiff, under a deed from the sheriff of Montgomery County, founded upon a sale for taxes, but which sale was admitted to be void because the requisites of the law in regard to the sales of land for taxes had not been complied with.

On the trial it occurred as a question whether a void deed is such a conveyance that a possession under it will be protected by the statute of limitations.

The judges being opposed upon this question, it was referred to the Supreme Court for its opinion. Chief Justice Marshall, in giving the opinion of the court, says: " The question now referred to this court differs from that which was decided in Patten's Lessee *v.* Easton, 1 Wheat. 476, in this, that the defendant, who sets up a possession of seven years in bar of the plaintiff's title, endeavors to connect himself with a grant. The sale and conveyance, however, by which this connection is to be formed, are admitted to be void. The conveyance, being made by a person having no authority to make it, is of no validity, and cannot connect the purchaser with the original grant. We are therefore of the opinion that the law is for the plaintiff."

It will be observed that the Tennessee act did not in express terms, as the Kentucky and Illinois acts do, require a connected title. This was only required by the construction given to the act by the Tennessee courts, and although these courts have since changed that construction, the authority of these cases, as

to the kind of conveyances by which a connected title is to be made, is not thereby in the least impaired.

All these cases, as well those in this court, as the New York, Louisiana, and Kentucky cases, recognize and apply to this and like cases the well-known maxim, *Ignorantia facti excusat; ignorantia juris non excusat.*

Mr. Justice WAYNE delivered the opinion of the court.

Upon the trial of the cause, after the plaintiff had introduced his testimony and rested his case upon it, the defendants, in order to bring themselves within the limitation act of Illinois, passed in 1835, offered in evidence as the foundation of their title a deed from the Auditor of Public Accounts of the State of Illinois. It purports to have been executed by virtue of a sale made on the 9th day of December, 1823, for the non-payment of taxes under the revenue act of February, 1823. The plaintiff's counsel objected to the introduction of the paper, and the court were divided in opinion as to its admissibility.

The act just mentioned requires the owners of lands to pay their taxes into the State treasury, on or before the 1st day of October. The seventh section declares, if they shall fail to do so, " it shall be the duty of the auditor to make a transcript from the books of all such delinquents, charging the tax with an interest at the rate of six per centum until paid, and all costs which may accrue," and that the auditor shall " cause the same to be advertised in the paper printed at the seat of government, or in some other paper printed in the State, for three weeks, giving notice of the day of sale, the last of which publications shall be at least two months before the day of sale, and the auditor shall proceed to sell, on the day fixed in such advertisement, the whole, or so much of each tract as will pay the tax, interest, and costs."

The second section of the act of limitation is as follows:—
" Every real, possessory, ancestral, or mixed action, or writ of right, brought for the recovery of any lands, tenements, or hereditaments of which any person may be possessed by actual residence thereon, having a connected title in law or equity deducible of record from this State or the United States, or from any public officer or other person authorized by the laws of the State to sell such land for the non-payment of taxes, or from any sheriff, marshal, or other person authorized to sell such land upon execution, or any order, judgment, or decree of any court of record, shall be brought within seven years next after possession being taken as aforesaid." Rev. Stat. 1845, p. 349.

Upon comparing this section with the acts of 1827 and 1829

upon the same subject, we have concluded that the section of the act of 1835 was not meant to give protection to a person in possession under a deed void upon the face of it. The mode of determining that is to test the deed by making a reference to the authority recited in it for making the sale, in connection with the act giving the auditor the power to sell. When the sale is found not to be according to that power, the deed is void upon its face, because the action of the auditor is illegal, and the law presumes it to be known to a purchaser. The latter can acquire no title under it. Being a void deed, possession taken under it cannot be said to be adverse and under color of title. What was the fact in this case? It is disclosed upon the face of the deed, that the auditor sold the land short of the time prescribed by the act. It was not, then, a sale according to law. That must have been as well known by the purchaser as it was by the auditor. The law presumes it to have been. The act under which the sale was made was not meant to prescribe the authority of the auditor only to make sales, but also to give to purchasers full information of the terms upon which a title could be acquired to lands sold for the non-payment of taxes. It was meant to put bidders at a tax sale upon the inquiry, whether or not the land was offered for sale according to law. If they do not examine, and shall buy land exposed to sale for taxes against the law, they do so at their own risk, and it will be presumed against them that they know that the deeds given under such circumstances are made in violation of official duty and of the law. It cannot be made the foundation of an adverse possession under color of title against the true owner of the land, whose title to it, the law says, can only be divested in a certain way for a failure to pay taxes due upon the land. We do not put the conclusion upon the point exclusively upon the fact that it is a void deed; but that it is so, being a deed made in violation of law. It is such a deed that the defendant proposes to use to let in the proof of a possession which will be protected by the statute of 1835. Upon general principles, such a paper would not be admissible as evidence for any purpose in ejectment, and we think it was not meant to be included as one of those titles of record provided for by the act of 1835. Before the limitation of the act can operate, it must be shown by one claiming its protection, that he has been in actual possession of the land to which it is sought to be applied for seven years before the commencement of the suit, by a connected title in law or equity, deducible of record from the State or the United States, or from any public officer or other person *authorized by law* to sell such land for the non-payment of taxes. Such language

36 *

does not apply to the general authority given by law to an officer to sell lands for taxes, but to what his authority is to sell the particular land for taxes which he exposes for sale. The words of the act are, to sell " such land for the non-payment of taxes " ; that is, that land which a party claims under the deed, and from his actual residence of seven years upon it. Can it be said, then, when the auditor, as he did in this instance, sells land for non-payment of taxes short of the time that the law authorizes him to sell, that he was an officer authorized to sell such land for the non-payment of taxes? We think not. This interpretation is more in harmony with the title which the act require before its protection can attach. A title and seven years' actual residence upon the land are necessary. The legislature must have meant by title something more than a void deed upon its face ; a title, at least, which would be sufficient to induce the possessor of the land to think, and the law to conclude, that there was a foundation for a possession under a right which had been acquired by a purchase. Not a mere naked possession, but one taken in good faith by a purchaser. The protection intended by the act cannot be better expressed than it is in the able printed argument of the plaintiff's counsel. " The legislature intended to extend its protection to persons who occupied land under a connected title *primâ facie* good, against proof *aliunde* which would rebut or destroy such *primâ facie* title." This conclusion too is supported by the case of Skyles's Heirs *v.* King's Heirs, in 2 A. K. Marshall. The act of 1835 was copied from the Kentucky limitation act of February, 1809, and after the courts of Kentucky had decided that " the true construction of the words of the statute, ' a connected title in law or equity deducible from the Commonwealth,' does and must mean such a title when tested by its own face, and not tried by the title of others. If the defendant's title should be a connected title in law or equity, supposing no other to exist upon the ground, then if he proves seven years' possession holding under it, the statute shall aid him, although the plaintiff may be able to show, by the production of his own title or that of others, that the title did not in fact nor in law pass to the defendant." Illinois having taken the act from Kentucky, it is certainly not unreasonable to suppose that her legislators knew the construction which had been put upon it, and meant the act to give protection according to that construction.

We shall direct the point certified to this court to be answered, that the paper offered in evidence by the defendant is a void deed upon the face of it, and was not admissible as evidence for the purpose for which it was offered.

Mr. Chief Justice TANEY, Mr. Justice CATRON, and Mr. Justice GRIER dissented.

Mr. Chief Justice TANEY.

Upon the statements and admissions contained in this record, the question certified for the decision of this court is a very narrow one; but at the same time one of much nicety and difficulty. It is admitted that the defendants had possessed the land in dispute by actual residence thereon for the term of seven years next preceding the commencement of this suit. And if they had paid the taxes during that time, it is very clear that they were protected by the act of limitations of 1839, and the deed would in that case have been admissible in evidence. For the suit appears to have been instituted in 1848, and more than seven years had then elapsed after the passage of that act. But the case as stated is silent as to the payment of taxes; and it does not appear whether they were or were not paid by the defendants, or by any other person. The rights of the parties, therefore, according to the statement as certified, must be governed by the act of limitations of 1835, and not of 1839.

The act of 1835 is loose and ambiguous in its language, and open to different interpretations. Expounded literally, it might seem to mean that a party who had a valid title on record should be protected in his possession after the lapse of seven years. This certainly was not the meaning of the legislature, because a good title of record needed no protection from a statute of limitations. It is obvious that one of the main objects of the law was to protect the possession of persons who purchased upon the faith of conveyances made by the public officers of the State, who were authorized to sell and convey; but whose deeds, from some mistake or error of judgment on their part, were sometimes not valid, and conveyed no title to the purchaser. The law was made for a new country, where the purchasers of small tracts of land were mostly immigrants, unacquainted with the laws regulating sales and conveyances of real property; and many of them unacquainted even with the language in which the laws were written. Skilful and experienced conveyancers were not to be found in every part of the country, from whom they might take counsel. And they would naturally and fairly rely upon conveyances made by the officers of the State, purporting to be made in the execution of their official duty. It was manifestly the object of the law to protect the possessions of persons of this description, and by that means induce an agricultural population to settle in the State; and its loose and inaccurate language ought to be interpreted

in the same spirit. It gave to the original owner seven years to assert his title. And if he chose for that period of time to acquiesce in the sale, and to suffer the purchaser and those claiming under him to possess and improve the land as their own, he was barred by his laches. And it undoubtedly also intended to prevent persons from prying into titles and searching for legal defects in older possessions, for the purposes of speculation, where the party holding them had honestly bought and paid his money, and the original owner had for seven years acquiesced in the sale.

It is true that the case before us admits that it appears by the recitals in the deed of the auditor that the notice of the sale was not as long as the law required. And it is said that every person is presumed to know the law, and that every one who afterwards purchased under this title must therefore be presumed to have known that this deed was void.

Undoubtedly, as a general principle, every one is chargeable with a knowledge of the law in civil as well as criminal cases. This, however, is a legal presumption which every one knows has no real foundation in fact, and has been adopted because it is necessary as a general rule for the purposes of justice. And laws are therefore often passed to protect persons who have acted in good faith in matters of property from the consequences of their ignorance of law. Thus, laws confirming defective and void deeds for real property have frequently been passed in some of the States; and their validity has been recognized by this court. Limitation laws in regard to suits for real estates are founded upon the same principle. For if the title papers of the party in possession are all legally executed, and made by persons who had the right to convey, he does not need the protection of an act of limitations. The act before us was evidently and especially intended to protect purchasers from the consequences of their ignorance of the law. And with this object in view, it could make no difference whether the legal defect was shown by the recitals in the deed, or appeared in any other way. The buyer would be as easily and naturally misled by his want of legal information in either case. And the law itself certainly draws no distinction between ignorance of the law in one respect and ignorance in another. And if every legal defect in the title papers of a purchaser in possession, as they appear on the record, may be used against him after the lapse of seven years, the law itself is a nullity, and protects nobody.

To a person not well skilled in all the details of the tax laws of the State, this deed upon the face of it appears to be good. It was made by a public officer authorized to sell for taxes.

Moore *v.* Brown et al.

From his official station and duties, he would be presumed to be familiar with the tax laws in all their minute details. And he recites what he had done; states the notice given, as if it was the notice the law required; and professes to convey to the purchaser a valid title in due form. Almost every one, not perfectly acquainted with the different tax laws which had been passed, would rely upon it. And I think it is one of those defective conveyances by a public officer, which the law of 1835 intended to protect after a possession of seven years.

It is said in the argument, and a judicial decision is quoted to support it, that the limitation is confined to cases where the title upon the record appears to be a valid legal title until a better one is produced. If that be the construction of the law, it protects the purchaser where, by the mistake of the officer, land has been sold upon which no taxes were due, provided the deed upon the face of it appears to be valid, and refuses to protect him where the taxes were actually due and the land liable, provided an error in the proceedings appears in the recitals in the deed. In other words, it bars the recovery of the innocent owner whose land has been wrongfully sold, and protects the defaulter. Such could hardly have been the intention of the legislature. And in my opinion the language of the law does not justify this construction. Indeed, if it be as contended for in the argument, then a mere oversight in reciting the date of the notice or date of the sale deprives the purchaser and those claiming under him of the protection of this law, although the taxes were due, and the sale regularly and fairly made. For the error will appear in the recorded instrument, and consequently it is not a good and valid title on record. And this may have been the case in the deed before us.

The consideration paid at the tax sale is indeed so small, as to create doubts of the fairness of the transaction. But that question is not open in this court upon the point certified. The statement in the record does not impute bad faith to either of the parties to this sale, and moreover the present defendants were not the original purchasers. For aught that appears in the statement, they purchased for a full consideration, and without any actual knowledge or suspicion of a defect in the title, and have therefore strong equitable considerations to support them in claiming the protection of this statute of limitations.

I am sensible, however, as I have already said, that the construction of this statute is by no means free from difficulty. But as I do not concur in the interpretation given to it by a majority of my brethren, and the decision of the question certified may affect wider interests than those immediately

involved in this suit, I have felt it my duty to state the grounds on which I dissent.

Mr. Justice CATRON.

My objections to hearing this case are so strong, that I deem it proper to state them. This court stands exposed to impositions by fictitious cases more than other courts do, for several reasons. We have adopted it as a rule of practice, that third persons cannot be heard to prove before us that a case pending on our docket is feigned, and a decision sought at our hands intended alone to affect other men's rights, by combination of the parties of record.

In the case of Patterson *v.* Gaines, the attempt was made, but refused, because the persons applying to dismiss the case, were no parties of record, and had no right to be heard.

This of necessity throws us on the case itself, as here presented by the record, to ascertain whether it is fictitious. It is a case made on a certificate of division; and as those divisions of opinion are usually granted of course, on facts agreed by the parties, and as they have been ordinarily granted without examination on part of the court, by way of concession, if requested by both sides, (as is the case here,) we are very liable to be imposed on; certainly more so than other judicial tribunals, where certified cases are not allowed; and as the consequences here involved are uncommonly great, it is proper to observe unusual care to guard against imposition.

The consequences of our decision will be apparent from the following facts.

Military bounty lands were located and granted in Illinois for services rendered in the war of 1812, with Great Britian, in the name of each soldier, as it stood on the muster-roll. This grant enures to the benefit of his heir by act of Congress. The United States caused the lands to be located and patented in a body, exceeding three millions of acres, in what is known as the military tract in that State, which fronts on the Mississippi River, and is unsurpassed in fertility by any equal body of land on this continent.

The land in controversy is situated in this district, and is designated as the south half of section thirty-five, in township twelve north, of range one west of the fourth principal meridian.

Most of these grants remained without ostensible owners for many years, and have furnished, and continue to furnish, a great source of speculation. On them the tax laws of Illinois operated, and a great portion of them have been sold for taxes. This is a prominent part of the history of Illinois. It was

stated in discussion of the case of Bruce *v.* Schuyler (4 Gilman, 249), that eight millions of dollars worth had been thus sold, up to 1847. And, taking the State throughout, a much greater quantity than this, no doubt, is held under tax sales, and auditor's deeds, like the one before us. It conforms to the act of 1826, which prescribes a form, and applies to deeds founded on previous and subsequent tax sales. Auditor's deeds, in the military tract, are the most usual title. Under this state of things, that section of country has been settled and highly improved by a large population; cultivators confidently relying on these deeds as valid titles.

The Supreme Court of Illinois held, in the case of Garrett *v.* Wiggins, 1 Scammon, 335, that the act of 1829, declaring auditor's deeds, standing alone, as evidence of a good title, did not apply to sales made previous to the passing of that act. And the deed of Wiggins, not having been supported by extraneous proof that the land had been legally advertised for sale, was declared to have been made without authority, and was rejected. It follows, that all deeds founded on tax sales made before 1829 are void "on their face," when standing alone. They must be supported by the act of limitations, or fall to the ground; and this support we are asked to withdraw by our decision, proceeding on a case made up under the following circumstances.

On the cause being taken up for trial in the Circuit Court, plaintiff introduced his title, regularly derived from the United States. He admitted, by special agreement, that the defendants were in possession when the suit was brought. They then offered to prove that they had been seven years in possession, holding under a connected title derived from a public officer, authorized by law to sell the land for non-payment of taxes, and, as the first link in their chain of title, offered a deed made by the auditor, which is set out. To its introduction the plaintiff objected, on the ground that, by reference to the face of the deed, "and the law as it stood" when the sale was made, (to wit, "An Act entitled An Act for levying and collecting a tax on land, and other property," approved February 18, 1823,) it appeared that the sale for non-payment of taxes had been made by the auditor "at an earlier day than he could, according to law, possibly do; and so it occurred as a question, whether said deed was admissible in evidence for the purpose, and in the connection for and in which the defendants offered it, the objection aforesaid notwithstanding: on which question the opinions of the judges were opposed."

This is the case certified for our opinion. The parties agreed to the facts, made the case, and conjointly moved for a

certificate of division. It was especially the act of the defendants, as on their right to make defence we are asked to pass judgment.

It is agreed, that they held under a void deed; that it was not made according to law, and void on its face. They admit that the auditor did an act which he could not possibly do as auditor. Thus, the defendants by this agreement made the worst case for themselves that they could make, and the best case for their adversary that could be made up, for the purpose of having a decision against the defendants on the act of limitations. This is manifest, and not open to dispute. No power is left to this court to inquire whether the auditor had, or had not, authority to sell for taxes due in the years 1821 and 1822, by advertising in advance of October 1, 1823, for three weeks, and selling afterwards, in December, when the eighty-two days required by the act of 1823 had expired from the first advertisement.

The 26th section of the act declares, that the first sale of lands made by the auditor shall take place in December, 1823; at what time in December, the act does not provide. It depends on a true construction of the law. But the agreement cuts off all power of inquiring as to what the true construction of the law is; it concludes the question, and forces us to hold that the auditor sold without authority, and that his deed is void on its face; whereas the deed recites, that the land had been sold " in conformity with all the regulations of the several acts in such cases made and provided." It refers to no one particular law, and is fair on its face; nor could any man, not learned in the law, suppose to the contrary. Certainly not Illinois farmers, many of whom do not even read or speak our language.

In the next place, a written argument is furnished to us by the plaintiff, coming from Illinois, presenting his case in the most cogent manner, on which it is submitted; whereas, the defendants make no appearance here by counsel, set up no defence, but give the plaintiff every advantage he may desire, or can possibly have. As I have never known a real contest thus conducted, my mind is led to the conclusion, that this is a fictitious proceeding, intended to open a door for speculation, and to affect the rights of others, and that it ought not to be acted on by this court. But as a majority of my brethren are unwilling to dismiss the case, and have proceeded to decide the question whether a deed purporting to be founded on a tax sale, and which is void on its face (when compared with that law), furnishes color of title, I of course acquiesce, and will briefly examine that question.

For the purpose of arriving at a proper construction of the act of limitations of Illinois, the previous legislation of that State must be taken into consideration, so far as it can be done, from the meagre information we have been enabled to collect. From this legislation, so far as it is ascertained, it appears that the auditor was bound by law to make deeds to purchasers at tax sales, according to the prescribed form given by the act of 1826. These deeds were ordered to be recorded. The one before us is in the prescribed form, and stood duly recorded when the act of limitations was passed.

The act requires actual residence on the land for seven years, under a connected title deducible of record from the State, or from the United States, or from any public officer authorized by the laws of the State to sell lands for the non-payment of taxes.

This act is peculiar in its terms, and was made under peculiar circumstances. It was unquestionably made, as it seems to me, to protect actual settlers and cultivators, whose titles were liable to exception, against speculators and others having better titles, but who should neglect to avail themselves of their legal advantage within the time limited. In order to make a successful defence, it was necessary for these defendants to prove a seven years' residence on the land, under a connected title deducible of record from the State of Illinois, or from some public officer acting for the State, authorized to sell for non-payment of taxes. The auditor was such officer. He acted for the State; and a title in all respects emanating directly from the State is exhibited in support of a seven years' possession. A connection with a patent from the United States is equally clear. The land was assumed to be sold by force of lien for taxes due; such sale carried the true owner's title throughout, including the patent, regardless of the fact in whose name the land was advertised and sold. So the laws of Illinois expressly provide. No further connection of title can exist; nor does the act of limitations require more. But to avoid its force, an attempt is made to introduce an exception not found in the act, which of necessity comes to this, that if the deed is void for legal defect, or for a defect which depends on evidence, a link in the chain of title is wanting.

If it be true that the purchaser under a tax sale and deed is bound to ascertain the law, and if the deed is found to be void when tested by the law, and the acts done under it, no connection can be established, nor protection had, under the act of limitations; then the statute is a mere delusion, as it can only be resorted to where there is a good title.

The act was not thus idly made. It has no reference to

titles good in themselves, but was intended to protect apparent titles, void in law, and to supply a defence where none existed without its aid. Its object was repose. It operates inflexibly, and on principle, regardless of particular cases of hardship. The condition of society, and protection of ignorance as to what the law was, required the adoption of this rule. This is plainly so. It was not to be expected that immigrants into a new country like Illinois, who came there seeking lands for homes, were capable of judging what complicated revenue laws required to be done to make a valid tax sale. If they found a title of record from a public officer, such as the auditor was, having general power to sell for non-payment of taxes, they were authorized to believe such title a good one, and to purchase under it. And it would be bad policy, and unjust, after the land had been improved by their labor, and increased in value perhaps twenty-fold, during a long possession, to turn them off, even by a meritorious owner, if he did not come in time. And still worse policy would it be, to leave them open to speculating purchasers, buying up doubtful titles over their heads, under the act of 1845, which allows of such purchases in Illinois. Harassment and ruin inflicted on the unsuspecting many, by the well-informed and unscrupulous few, must be, as it ever has been, the consequence of stripping cultivators of the soil of their titles by unfavorable and strained constructions; and therefore acts of limitation have at all times been liberally construed to protect cultivators in homes where their families were, and had usually grown up. And as the act of Illinois applies to actual residents, and to no others, it is entitled to a liberal construction. The one contended for is, that he who takes title by deed of record, or under one claiming by deed of record, made by a public officer with general power to sell for non-payment of taxes, is bound to know the law authorizing the officer to sell and convey; and if he fails to ascertain the law by negligence, he is held to knowledge that power was wanting, if such be the fact; that, purchasing with presumed knowledge, his title is taken in bad faith; his deed is tainted with fraud, and is no deed, but is as blank paper; and being so, a link in the chain of title is wanting, and the statute cannot apply, for want of connection of title.

This is the sum and substance of the reasoning employed on behalf of plaintiff to reject the application of the statute. Now, is this a liberal construction? Is it not in effect a repeal of the statute, and the most harsh construction that can be given to it? As, if this assumption be true, no possible conveyance made by a public officer, which is void because the

requisite forms of law have not been complied with, can be maintained. All must equally fall, if not good in themselves, when compared with the law, and the acts required by law to be done before the sale is made.

We have been referred to various decisions which are supposed to support this doctrine, and especially to that made by the Court of Appeals in Kentucky in 1820, in the case of Skyles *v.* King, 2 A. K. Marsh. 385. This case has had controlling influence in our investigations; by far more than all others. It was this. The elder patent was made to King. Skyles claimed and held under a younger patent, and seven years' adverse possession. He was defendant. The statute of Kentucky declares, that to form the bar there shall be " a connected title in law or equity, deducible of record from the Commonwealth." On a trial before a jury, it was insisted that, by the terms of the act, it applied to the elder patent set up by plaintiff; that with his patent there must be connection to form a bar. And so the Circuit Court held the true meaning of the act to be, and so instructed the jury. But the Court of Appeals thought otherwise, and reversed the judgment, holding that the act meant a title tested by its own face; that is, commencing with the younger patent, and connecting with that, regardless of the elder and adversary title; that the act had no reference to the elder patent. There, the first link (the younger patent) was void, and this plainly appeared of record, as all patents in Kentucky are recorded; it follows, that, if that decision is adopted as a true construction of the Illinois statute, the case before us must be decided for the defendants; as here the first title paper offered by them is in the same condition as the younger Kentucky patent.

The cases in this court of Patton's Lessee *v.* Easton, 1 Wheat. 476, and of Walker *v.* Turner, 9 Wheat. 541, are also relied on as in point. The latter one is clearly so. It held that a void sheriff's deed was no deed, and could not be given in evidence as a link in the chain of title, nor be upheld by seven years' adverse possession, under the act of limitations of Tennessee, which required a title by grant, or deed of conveyance founded on a grant, to form a bar; and which was construed to require connection of title. This court followed the supposed settled construction of the courts of Tennessee on their own statute. But this was a mistake, there not being any such settled construction.

In 1832, the case of Green *v.* Neal, 6 Peters, 291, again brought before this court the same question on the Tennessee act. At that time, all controversy was settled by a decision of the Supreme Court of Tennessee, in the case of Gray and

Reeder *v.* Darby's Lessee, Martin & Yerger, 396, which held that a sheriff's sale and deed, made pursuant to a void judgment, in a case where no jurisdiction existed in the court entering such judgment, was a sufficient connection of title; that to hold otherwise would be requiring a good connected title, and a virtual repeal of the statute. This decision was followed in the case of Green *v.* Neal; and all the former cases decided by this court on the Tennessee act, holding that a void deed broke the connection, were overruled, and are of no authority anywhere. They merely followed a supposed settled construction in the first two cases, and a settled one in the last case of Green *v.* Neal. And so we would now be bound to follow the settled construction of the courts of Illinois, if any such existed, on the statute before us.

My opinion, therefore, is, that it ought to be certified to the Circuit Court, that the auditor's deed should be admitted in evidence, and that it furnishes color of title on which the act of limitations could operate.

## *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Illinois, and on the point and question on which the judges of the said Circuit Court were opposed in opinion, and which was certified to this court for its opinion, agreeable to the act of Congress in such case made and provided, and was argued by counsel. On consideration whereof, it is the opinion of this court, that the paper offered in evidence by the defendant is a void deed on the face of it, and was not admissible as evidence for the purpose for which it was offered. Whereupon it is now here ordered and adjudged, that it be so certified to the said Circuit Court.